■ SCOTT M. BETHUNE, Respondent, v ALEXANDER J. BETHUNE, Appellant.—In an action to recover tuition and related costs claimed to be due plaintiff pursuant to a separation agreement entered into between defendant, his father, and plaintiff's mother, defendant appeals from a judgment of the Supreme Court, Nassau County, entered January 6, 1977, which is in favor of plaintiff in the principal sum of $3,100, after a nonjury trial. Judgment reversed, on the law and the facts, and complaint dismissed, with costs. Plaintiff is the son of the defendant. Plaintiff's mother, not a party to the action, and his father, entered into a separation agreement in May, 1968. The parents were subsequently divorced. The issue to be resolved is whether, under the terms of the separation agreement, defendant is required to defray plaintiff's college tuition expenses for the year 1976. Plaintiff sought to recover the sum of $5,453, but was awarded judgment in the amount of $3,100. The trial court initially and correctly held that plaintiff, despite his mother's refusal to join in the action, had the requisite status as a third-party beneficiary to initiate the action, citing *Forman v Forman* (17 NY2d 274). After noting that the father had paid for the plaintiff's first year at the University of North Carolina, i.e., 1973, plaintiff's education was interrupted by, firstly, his marriage, and, secondly, his working. In awarding judgment to the plaintiff, the trial court anchored its

opinion to paragraph 11 of the separation agreement, which provides: "11. In the event that any of the children of the parties shall attend a college, university or other school beyond the secondary level, the husband shall pay all of the expenses of said schooling, including but not limited to tuition, registration, athletic fees, library and laboratory fees, transportation, room, board and uniforms, if required, and said payments shall not in any way reduce the payments required hereinbefore to be made by the husband to the wife for the support of the issue but shall be in addition thereto. The school to be attended by any of the children shall be chosen by the mutual consent of the parties hereto or by the child involved." Defendant asserts that paragraph 9 of the separation agreement is the controlling provision. It provides, in pertinent part: "The support for the minor issue of the parties shall continue as hereinbefore provided until each of said minor issue has reached the age of twenty-one years, or becomes self-supporting or marries, and shall be extended beyond said date in the event that said issue is in full time attendance at a college or university until such time as the said issue has completed his or her schooling." Prior to embarking upon construction of the separation agreement some additional background is relevant. Plaintiff commenced his studies at the University of North Carolina (at Chapel Hill) in September, 1973, and resided in the dormitories during the school year. Defendant paid for his costs during the first year of college. Plaintiff had a rather unsuccessful academic year and failed two courses. In May, 1974, at the close of the academic year, plaintiff moved in with his mother, who was living in Southern Pines, North Carolina. During the first two months of the summer plaintiff did construction work in North Carolina. In late July, 1974 plaintiff was arrested for driving under the influence of alcohol and, after spending one night in jail, pleaded guilty to the charge of reckless driving. During the first part of August, 1974, plaintiff admittedly was "ask[ed] to leave" his mother's house, and he did so, flying to New York to live with his father. According to defendant, he first learned of plaintiff's "visit" when he received a "desperate" call from plaintiff's mother asking him to meet plaintiff at the airport. Defendant testified that plaintiff's mother advised that "she could no longer control him. That he had been involved in a mess with some cars * * * and that she was very sorry that she would have to push him out of North Carolina, was the expression she used, send him up to me and see if by some chance I could help to straighten him out." Defendant and his wife met plaintiff, who had "two or three very heavy bags", at the airport and transported him to defendant's home in Mill Neck, Long Island. There are disputed questions of fact both as to the length of this visit and as to the nature of the conversation between father and son. Plaintiff contends that he stayed for about a week and a half, and that he discussed college with his father, who refused to send him back to school. Defendant claims that plaintiff spent only four days in the house and that there was no discussion about plaintiff's going back to school. In any event, it is undisputed that plaintiff left within a relatively short period of time with the daughter of defendant's wife (whom he had just met upon his arrival in New York). Their destination was Bristol, Virginia, where defendant's stepdaughter had been attending college. On August 16, 1974 the couple was married in Bristol and took an apartment. It is unclear what their immediate plans were—Bruce Bethune, plaintiff's brother, testified that he had gone to Bristol for the wedding and that plaintiff told him he "was going to get a job and they were going to stay there". Bruce assumed that plaintiff's bride was going to go to school. Defendant stated that plaintiff advised him, in a telephone conversation,

that he would work while his wife went back to school. Allegedly, plaintiff sent defendant's wife a check because he understood that he and she would split the cost of her daughter's education. However, plaintiff remained in Virginia for only one month. Neither he nor his wife was able to obtain employment. They moved to Chapel Hill, North Carolina, because plaintiff knew the area well and thought they would have an easier time finding jobs there. Plaintiff did, in fact, work for a magazine/newspaper distribution agency for six months and at a factory for 10 months. During that period he admittedly made no attempt to resume his studies at the University of North Carolina; nor did he inquire as to whether there was student aid available to him. Stuart Bethune, an older brother of plaintiff who is a graduate student at the University of North Carolina, testified that while plaintiff was working he had several discussions with plaintiff, during which he advised him to return to school. Plaintiff allegedly changed his mind "off and on; sometimes he wanted to go back, sometimes he didn't." In November, 1975, 18 months after his last attendance at the University of North Carolina, plaintiff asked defendant to send him back to school. Plaintiff contends that he had recently learned about the terms of the separation agreement and that he discussed the agreement with his father. Plaintiff testified that his father refused his request. However, the following month at a Christmas gathering at plaintiff's mother's home, plaintiff's brother Stuart offered him two checks from his father. Plaintiff refused to accept one, in the amount of $491.60, allegedly because defendant conditioned support on the premise that plaintiff's wife should work. Plaintiff did accept a second check, for $100, which he used "mostly to buy Christmas presents and also for the deposit and for the application fee" at the University of North Carolina. Stuart Bethune, who conveyed those checks to plaintiff, testified that assistance was to be based upon an understanding as to three things. One was that plaintiff's wife work, "so it was clear that that money was to be used solely for [plaintiff] for his expenses for what he needed to go to school." The second understanding was that he get good grades. The third was that the money be funneled through Stuart "so that we could be sure that the money was being used for expenses related to going back to school." In any event, plaintiff re-enrolled at the University of North Carolina in January, 1976. The instant action, seeking $5,453 for "tuition and related costs together with the plaintiff's living expenses * * * for calendar year 1976", was commenced in March, 1976. At the time of the trial, in November, 1976, plaintiff was still in attendance at the university. He had failed two courses (while passing two) during the spring semester ("because I was really concerned about this case"), but testified that he was "doing well" during the fall semester then in progress (this despite an arrest for possession of amphetamines on the Chapel Hill campus). The judgment under review awarded plaintiff the principal amount of $3,100, representing "the reasonable value of institutional and living expenses for two semesters of college." The rationale for the judgment is that the two key paragraphs of the separation agreement cited previously impose separate and distinct obligations upon the father. On the contrary, we believe they must be construed *in pari materia* and, indeed, the separation agreement considered as a whole. Thus, "support for the minor issue", including college expenses, shall continue "until each of said minor issue has reached the age of twenty-one years, or becomes self-supporting or marries, and *shall be extended* beyond said date *in the event* that *said issue is in full time attendance* at a college or university *until such time as the said issue has completed his or her schooling.*" (Emphasis supplied.) It is therefore clear upon the face of

the agreement that educational support beyond the age of 21 years, self-sufficiency or marriage is required only in the event that a child is in the process of going to school "full time" to complete his education. It is our opinion that the agreement never contemplated the situation presented at bar, in which a child abandoned his college career, married, became self-sufficient for 18 months, and then opted to resume his chequered college career. While plaintiff's testimony was to the effect that he failed to return to college in September, 1974 because of his father's refusal to pay his way, such an explanation strains credulity in light of all the evidence. We cannot believe that plaintiff eloped to his bride's college town in Virginia shortly after his arrival on Long Island because his father had wrongfully cut short his college education. Rather, it would appear that plaintiff was undergoing a period of self-adjustment during which it was not clear to him what course his future should take. The credible evidence suggests that plaintiff intended to leave school and work—possibly to put his wife through school. His move to Bristol, Virginia; his stated reason for returning to Chapel Hill; and his failure to reapply for admission or to apply for financial aid all belie any assertion that he failed to continue in full-time attendance because of his father's refusal to send him back. (Indeed, in the light of plaintiff's refusal to accept the aid tendered by his father in December, 1975 because that tender did not give plaintiff absolute control over the funds, one cannot help but question the sincerity of plaintiff's avowed intention of completing his education.) Under these circumstances defendant's obligation ceased, for it can hardly be seriously argued that the separation agreement binds him ad infinitum. Special Term demurred that it need not consider the hypothetical situation of plaintiff becoming, as it were, "ein ewiger Student". The father would then possibly have to defray many years of university attendance, up to and including, perhaps, a doctoral and postdoctoral education. Our present determination undoubtedly and unquestionably would constitute the law of the case in the event the father were to reject future claims for tuition beyond the year in question. The plaintiff became emancipated upon his marriage and his entering full-time employment. He cannot, at his option, revert periodically to his former status as an unemancipated, unmarried child at his caprice. Providing a college education, as we held in *Matter of Hawley v Doucette* (43 AD2d 713, 714), "is not a necessary" and need not be undertaken unless it is clearly the father's contractual obligation. Absent such agreement, we see no "special circumstances" imposing such obligation. Indeed, the concluding language of paragraph 9 provides that "all of the above payments shall be made by check or postal money order to the wife [mother] at such place as she may designate." Paragraph 11, by its very terms, and in the context of the entire agreement, also imports continued dependency, for the prior child support provisions are not to be reduced by the child's attendance at college. Thus, child support and college tuition are coupled. A father even under a contractual obligation may also impose reasonable conditions, such as requiring the child to live at a dormitory rather than off campus which, if rejected, absolve him from providing tuition (*Matter of Roe v Doe,* 29 NY2d 188). The separation agreement, in our opinion, properly construed as an entity, should not be enlarged by strained construction as to mandate an open-ended, if not unending, obligation to provide university tuition and "living expenses" to an emancipated adult-child. Hopkins, J. P., Margett and Hawkins, JJ., concur; Cohalan, J., dissents and votes to affirm the judgment.